UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIC LEMOINE and TTC PERFORMANCE PRODUCTS, INC., *d/b/a* BLACK ACES TACTICAL,     *Plaintiffs*, <br><br> v. <br><br> MOSSBERG CORP. and O.F. MOSSBERG & SONS, INC.,     *Defendants*. | 3:18-CV-01270 (KAD) <br><br><br><br><br><br><br><br><br><br> JUNE 16, 2020 |

## CLAIM CONSTRUCTION

Kari A. Dooley, United States District Judge

This case involves a patent infringement dispute between plaintiffs Eric Lemoine and TTC Performance Products, Inc., d/b/a Black Aces Tactical, (collectively, "Black Aces") and defendants Mossberg Corp. and O.F. Mossberg & Sons, Inc. (individually and collectively, "Mossberg"). The patent at issue is U.S. Patent No. 8,756,846 (the "'846 Patent"). Presently before the Court is the parties' competing claim constructions. After considering the parties' briefs and the arguments made at the *Markman* hearing,[1] the Court adopts the following claim construction.

**Legal Standard**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Inova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2005)). "Claim construction is a legal statement of the scope of the patent right. . . ." *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir.

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

2014) (citation omitted; internal quotation marks omitted).  Accordingly, "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  "Although the court may consider extrinsic evidence, it is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record." *E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1068 (Fed. Cir. 2019) (alterations omitted; citation omitted; internal quotation marks omitted).  Intrinsic evidence includes the patent claims, the specification, and the prosecution history.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The parties did not submit the prosecution history of the '846 Patent for consideration and agree that the claim should be construed in light of the patent claims and the specification.

Claim terms are generally given their "ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.  "The claims, of course, do not stand alone.  Rather, they are part of a fully integrated written instrument consisting principally of a specification that concludes with the claims.  For that reason, claims must be read in view of the specification, of which they are a part." *Id.* at 1315 (internal citations omitted; internal quotation marks omitted).  "Consistent with that general principle, . . . cases [from the Federal Circuit Court of Appeals] recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs.  In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope

by the inventor.  In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* at 1316 (internal citation omitted).

When a court relies solely upon the intrinsic evidence, the court's construction is a determination of law. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015).

**Background**

On June 24, 2014, the United States Patent and Trademark Office issued the '846 Patent to Lemoine.  According to the '846 Patent, the subject invention is a "shotgun magazine receiver assembly" that "relates generally to shotguns and, more particularly to a retrofit magazine receiver for use with a conventional shotgun" and "allow[s] a user to rapidly fire and reload ammunition via a removable 'box' style magazine." ('846 Patent at col. 1, ll. 1–3, 34–35.)   By way of background, Lemoine explains that a conventional shotgun requires the user to load shells into the fixed magazine tube. (*Id.* at col. 1, ll. 15–19.) After firing each round, the user must load through a pump action the next round into the receiver for firing. (*Id.* at col. 1, ll. 19–21.) Lemoine notes that "[a]lthough rapid firing and reloading capabilities have been achieved with some small firearms. . . , they have not yet been satisfactorily achieved with shotguns." (*Id.* at col. 1, ll. 22–25.) Because "many shotgun owners often choose to upgrade their existing weapons with new stocks and barrels as opposed to purchasing a new weapon," Lemoine explains that "it would be beneficial to provide a shotgun magazine receiver assembly which can replace the stock receiver of an existing shotgun to allow a user to rapidly fire and reload ammunition via a removable 'box' style magazine." (*Id.* at col. 1, ll. 29–35.)

Through this action, Black Aces claims that Mossberg is infringing the '846 Patent by manufacturing shotguns that include this patented shotgun magazine receiver assembly.  Mossberg

responds that the receiver assembly that it uses in the shotguns that it originally manufactures to accept removeable box magazines do not infringe the '846 Patent because the '846 Patent covers only after-market conversion kits—that is, a receiver assembly designed to convert previously manufactured conventional shotguns into ones that can accept a removable box magazine.

The '846 Patent contains only one independent claim ("Claim 1") on which multiple other claims depend. The preamble to Claim 1 provides as follows: "A shotgun magazine receiver assembly for converting a conventional shotgun having a trigger assembly and barrel into a magazine loaded shotgun, said receiver assembly comprising. . . ." (*Id.* at col. 7, ll. 20–23.) Thereafter, Claim 1 and the dependent claims set forth multiple components which combine to describe the structure of the patented receiver assembly.

**Analysis**

The parties offer competing proposed constructions of two phrases in Claim 1. First, the parties disagree concerning the proper construction of the term "conventional shotgun" as that term is used in both the preamble and the body of Claim 1. Second, the parties offer competing constructions of the phrase "for converting a conventional shotgun" as it appears in the preamble. The resolution of this dispute depends, in part, on the outcome of a different issue—whether the preamble to Claim 1 is limiting. If the Court determines that the preamble is not limiting, it need not construe this phrase. Finally, Mossberg asserts that Claim 1 is indefinite under 35 U.S.C. § 112 because of its use of functional claiming.[2]

**"Conventional Shotgun"**

During the briefing on the claim construction, the parties submitted a joint claim construction chart. (ECF No. 69-1.) In that chart, Black Aces proposed that the term "conventional

---

[2] Mossberg agrees that the Court needs to reach the question of indefiniteness only if it rejects Mossberg's proposed claim construction.

shotgun" means "[a] shotgun" in its "plain and ordinary" sense and that "no further construction is necessary." (*Id.* at 2 (emphasis omitted).) Mossberg, in turn, submitted that the phrase "conventional shotgun" should be construed as meaning "[a] shotgun that does not accept a removeable box magazine." (*Id.*) The parties then submitted an amended joint claim construction chart in which they adopted Black Aces' proposed construction. (ECF No. 76-2 at 3; ECF No. 83-3 at 2.) Despite appearing to have reached an agreement concerning this term, Black Aces disavowed any such agreement in its opening brief and argued that the term "conventional shotgun" excludes shotguns that accept removable box magazines, the construction first urged by Mossberg. In a strange turn of events, Mossberg reversed course as well. Mossberg now urges the Court to use the agreed upon construction[3] and further asserts that the term "conventional shotgun" includes shotguns that accept removable box magazines (its prior advocacy notwithstanding), as such shotguns have been commercially available since well before the '846 Patent was filed. The Court does not view this dispute as particularly impactful on the Court's analysis but nonetheless addresses this issue first.[4]

The term "conventional" refers to that which is customary or traditional. *Conventional*, Black's Law Dictionary (11th ed. 2019) ("Customary; orthodox; traditional. . . ."); *Conventional*, Merriam-Webster Dictionary (last accessed June 12, 2020) ("of traditional design"), *available at* https://www.merriam-webster.com/dictionary/conventional. A person conjuring up images of a traditional shotgun—whether wielded by Elmer Fudd or Omar Little—simply does not imagine a shotgun with a removeable box magazine. Mossberg has not adequately explained why a person

---

[3] While the Court does not condone "bait and switch" litigation tactics, the Court is not convinced that Black Aces acted here with such an intent. Indeed, attached to the brief in which Black Aces identifies the term "conventional shotgun" as in dispute is the Amended Joint Claim Construction Chart that reflects otherwise. This suggests to the Court that Black Aces did not recall or understand the scope of its agreement, whether by inadvertence or some other cause.

[4] As discussed, this term is used in both the preamble and the body of Claim 1 and so this dispute must be resolved whether the preamble is limiting or not.

having ordinary skill in the art of firearms would have a different view of this term's meaning simply because shotguns that accepted removeable box magazines were commercially available prior to the issuance of the '846 Patent.  Products can be "commercially available" without being considered "conventional," "traditional," or "customary."  For example, if someone were to refer to a "conventional automobile," one would imagine a vehicle that utilizes a combustion engine, even though vehicles with electric engines have existed since the 1800s and hybrid and electric vehicles have gained increasing commercial success in recent years.  The Department of Energy, *The History of the Electric Car*, Energy.Gov (last accessed June 15, 2020), https://www.energy.gov/articles/history-electric-car.

Moreover, it is apparent that the term "conventional shotgun" as used in the '846 Patent excludes shotguns that accept removeable box magazines.  The "Background" section of the '846 Patent describes the functionality of a "conventional pump-action shotgun"; ('846 Patent at col. 1, ll. 7–8); and highlights its inability to accept a removeable box magazine; (*id.* at col. 1, ll. 9–21). The '846 Patent also consistently uses the term "conventional shotgun" to describe the type of shotgun that the subject invention can modify to accept removeable box magazines.  (*E.g.*, *id.* at col. 1, ll. 40–42 ("One embodiment of the present invention can include a receiver body capable of replacing a stock receiver body of a conventional shotgun."); *id.* at col. 6, ll. 38–40 ("the shotgun magazine receiver assembly **10** functions **to convert a conventional shotgun to accept and fire a box-style removable magazine** in a novel manner" [emphasis added]).)  These references would be bizarre indeed if the term "conventional shotgun" included shotguns that accept removeable box magazines.

For these reasons, the Court construes the term "conventional shotgun," as used in the '846 Patent, to mean "a traditional shotgun that does not accept a removeable box magazine."

6

**The Preamble Phrase "for Converting a Conventional Shotgun"**

Having determined the meaning of the term "conventional shotgun," the Court must next consider whether the phrase "for converting a conventional shotgun" in the preamble is limiting. Mossberg argues that the preamble is limiting and that this phrase should be construed as meaning "for retrofitting a shotgun after original manufacture." (Amended Joint Claim Construction Chart, ECF 83-3 at 2 (emphasis omitted).) Black Aces disagrees that the preamble is limiting[5] and further argues that Claim 1 includes any modification of a conventional shotgun that allows it to accept a removeable box magazine, regardless of whether the modification is made by a manufacturer in its factory or by an owner of an existing conventional shotgun. Black Aces asks the Court to construe the disputed phrase, therefore, as meaning "which may be used with conventional shotgun components." (*Id*. (emphasis omitted).)

If a preamble is limiting, it becomes part of the claim. *See Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."). "Whether to treat a preamble as a limitation is a determination resolved only on review of the entire . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (citation omitted; internal quotation marks omitted). "[T]here is no 'litmus test' for determining whether preamble language is limiting." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). The Federal Circuit

---

[5] Although Black Aces asserts that the preamble is not limiting, there is no substantive discussion of this issue in the Amended Joint Claim Construction Chart or its briefs. Rather, Black Aces goes directly to the proposed construction of the preamble phrase "for converting a conventional shotgun," which suggests, though the Court does not conclude, that the issue of whether the preamble is limiting is conceded.

7

Court of Appeals, however, has set forth some general principles to guide the inquiry. "Generally, the preamble does not limit the claims. However, a preamble may be limiting if: it recites essential structure or steps; claims depend on a particular disputed preamble phrase for antecedent basis; the preamble is essential to understand limitations or terms in the claim body; the preamble recites additional structure or steps underscored as important by the specification; or there was clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *Georgetown Rail Equip. Co.*, 867 F.3d at 1236 (alterations omitted; citations omitted; internal quotation marks omitted). In other words, a preamble is limiting if "it is necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc.*, 289 F.3d at 808 (citation omitted; internal quotation marks omitted). In contrast, "[a] preamble is not a claim limitation if the claim body defines a structurally complete invention and uses the preamble only to state a purpose or intended use for the invention. Preamble language merely extolling benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant." *Georgetown Rail Equip. Co.*, 867 F.3d at 1236 (alterations omitted; citations omitted; internal quotation marks omitted). Ultimately, "whether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent." *Bicon, Inc.*, 441 F.3d at 952 (internal quotation marks omitted) (quoting *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003)).

Turning to the '846 Patent, the Court concludes that the preamble to Claim 1 is limiting because it acts as an antecedent basis for the claims and it is essential to understanding the terms used in the claims. The preamble acts as an antecedent basis by introducing the terms "shotgun magazine receiver assembly" and "conventional shotgun" and by establishing the relationship between those terms. The preamble explains that the invention is not merely a receiver assembly,

8

but, more specifically, is "[a] shotgun magazine receiver for converting a conventional shotgun." ('846 Patent at col. 7, ll. 20–21.) Including this language as a limitation is essential to understanding the claims as drafted. Some of the components of the invention are described in the claims in terms of their ability to "mate" or "communicate" with a conventional shotgun or a conventional shotgun component. (*E.g.*, *id.* at col. 7, ll. 30–33 (describing the invention as having "at least one connector [in] a location that is suitable for mating with a complementary connector disposed on the conventional shotgun"); *id*. at col. 7, ll. 55–57 (describing the invention as having "extractor arm recesses" and "spring grove" that are "configured to communicate with a conventional shotgun extractor arm and spring, respectively"); *id.* at col. 8, 10–13 ("an indentation . . . being configured to communicate with the conventional shotgun trigger assembly").) Other components describe the need for the receiver assembly to be compatible with conventional shotgun components. (*E.g.*, *id.* at col. 7, ll. 36–40 (describing the invention as having a "shotgun barrel opening, and trigger assembly opening including a dimension suitable for receiving a conventional shotgun barrel, and trigger assembly, respectively"); *id.* at col. 8, ll. 40, 42–43 (a threaded tube magazine opening . . . configured to receive a conventional shotgun tube magazine").) These and other references in the claims are difficult to make sense of without consideration of the preamble, and the qualification contained therein, which makes the preamble essential to understanding the terms used in the claims.

To put it another way, the preamble gives "life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc.*, 289 F.3d at 808 (citation omitted; internal quotation marks omitted). The claims are written, and the structure of the invention is described, specifically in the context of the relationship between the invention and a conventional shotgun. The phrase "for converting a conventional shotgun" goes beyond defining the purpose of the claimed invention or extolling

9

its benefits.  The preamble gives important context for the nature and structure of the invention being claimed.  As a result, the preamble is limiting and part of the claims.

Having concluded that the preamble is limiting, the Court next must construe the meaning of the preamble and determine its effect on the scope of Claim 1.  The specification is an important part of this analysis.  "[C]laims must be read in view of the specification, of which they are a part." *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (citation omitted; internal quotation marks omitted).  As the Federal Circuit has explained, "the specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* (citation omitted; internal quotation marks omitted).  "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.  The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) (citations omitted; internal quotation marks omitted).

When considering the preamble in the context of the entire patent, the Court agrees with Mossberg that the phrase "for converting a conventional shotgun" refers to the conversion (or the retrofitting) of a conventional shotgun after original manufacture.  The Court begins its analysis with the plain language of the preamble.  The verb "convert" means "to alter the physical . . . nature or properties of" or "to change from one form or function to another." *Convert*, Merriam-Webster Dictionary (last accessed June 12, 2020), *available at* https://www.merriam-

webster.com/dictionary/convert. This verb, at the very least, suggests that some action is being taken on an existing object. As a result, a manufacturer who designs and produces a new shotgun that accepts a removeable box magazine would not ordinarily be said to have "converted" a conventional shotgun, as opposed to creating an entirely new one. To be sure, a manufacturer who reconfigures the receiver assembly of its conventional shotgun to accept removeable box magazines has arguably converted the **design of** the conventional shotgun. Such a broad construction is not reasonable, however, in light of other language in the specification that indicates that the claimed invention is for converting existing (already manufactured) conventional shotguns.

The specification on two occasions characterizes the "present invention" as a "retrofit" conversion kit for use with an existing conventional shotgun. ('846 Patent at col. 1, ll. 1–3 ("The present invention relates generally to shotguns and, more particularly to a retrofit magazine receiver for use with a conventional shotgun."); *id.* at col. 2, l. 66–col. 3, l. 1 ("the present invention includes a shotgun magazine receiver assembly which can act as a retrofit kit for existing shotguns").) Indeed, the specification is clear that "the present invention **is designed to be incorporated into existing shotguns**." (*Id.* at col. 1, ll. 46–47 (emphasis added).) These statements on their own provide a basis for finding disavowal or disclaimer. *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) ("We have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes . . .' or 'the present invention is . . .' or 'all embodiments of the present invention are. . . .'" ).

The specification also consistently describes the invention in terms of its ability to "replace," "convert," "mate with," or "be incorporated into" the receiver assembly of an existing

11

conventional shotgun.[6] ('846 Patent, p.1, ll. 6–9 (describing the invention of as "[a] shotgun magazine receiver assembly" consisting of "a plurality of connectors" designed "to secure the assembly to a stock barrel, grip, trigger assembly, and magazine tube of a conventional shotgun"); *id.* at col. 1, ll. 40–42 ("One embodiment of the present invention can include a receiver body capable of replacing a stock receiver body of a conventional shotgun"); *id.* at col. 1, ll. 46–47 ("the present invention is designed to be incorporated into existing shotguns"); *id.* at col. 3, ll. 30–35 ("The devise assembly **10** can function to replace the traditional receiver **4**, bolt **6** and slide **7** of a conventional shotgun **1** and to mate with all other factory supplied components so as to enable the conventional shotgun to utilize a box-style removeable magazine."); *id.* at col. 3, ll. 36–37 ("The receiver body **30** can function to replace the stock receiver of a shotgun to which the assembly will be installed."); *id.* at col. 3, ll. 43–51 ("Any number of connectors C . . . can be disposed along the receiver body at locations identical to those found on the stock receiver **4** in which the new receiver body **30** is replacing.  These connectors C acting to allow the receiver body **30** to mate with the complementary connectors C . . . in a traditional manner utilizing conventional manufacture supplied hardware. . . ."); *id*. at col. 5, ll. 57–59 ("the shotgun receiver assembly **10** can be mated with all remaining stock components of the conventional shotgun necessary for proper operation"); *id*. at col. 6, ll. 38–40 ("Accordingly, the shotgun magazine receiver assembly **10** functions to convert a conventional shotgun to accept and fire a box-style removeable magazine in a novel manner.").)

Lemoine further states in the "Background" section of the patent that the utility in his invention lies in its ability to modify existing conventional shotguns.  Lemoine explains that "many

---

[6] Notably, Black Aces uses this same characterization in its claim construction briefs. (*E.g.*, Plf.'s Op. Br. at 1–2 ("The invention embodied in the '846 Patent allows, for the first time in the shotgun's history, the ability of shotgun owners to adapt their shotgun's 'stock' receiver by replacing it with a removable 'box' style magazine."), ECF No. 75.)

firearm owners routinely modify their weapons to suit a particular interest, look or to accomplish a desired function." (*Id.* at col. 1, ll. 26–28.) Shotgun owners in particular "often choose to upgrade their existing weapons with new stocks and barrels as opposed to purchasing a new weapon." (*Id.* at col. 1, ll. 29–31.) "Accordingly," Lemoine asserts, "it would be beneficial to provide a shotgun magazine receiver assembly which can replace the stock receiver **of an existing shotgun** to allow a user to rapidly fire and reload ammunition via a removable 'box' style magazine." (*Id.* at col. 1, ll. 31–35 (emphasis added).) These statements reinforce that the subject invention is limited to a receiver assembly conversion kit to be used with existing, that is, already-manufactured, conventional shotguns.

Notwithstanding the foregoing, Black Aces maintains that the '846 Patent encompasses any shotgun receiver assembly that matches the description in the patent, regardless of whether that receiver assembly is being used to convert a conventional shotgun after market or in the manufacturing process. Black Aces first contends that the specification's reference to retrofit kits merely describes one embodiment of the claims. In support of this argument, Black Aces notes that "[t]he specification clearly expresses its intention that embodiments are not limited." (Plf's. Resp. Br. at 15, ECF No. 83.) Black Aces is correct that the '846 Patent contains language indicating that certain embodiments depicted or described in the patent are merely examples and should not be construed as limiting. (*E.g.*, '846 Patent col. 1, ll. 53–56 ("Presently preferred embodiments are shown in the drawings. It should be appreciated, however, that the invention is not limited to the precise arrangements and instrumentalities shown."); *id*. at col. 2, ll. 44–47 ("As required, detailed embodiments of the present invention are disclosed herein; however, it is to be understood that the disclosed embodiments are merely exemplary of the invention which can be embodied in various forms.").) The Court does not read these disclaimers as establishing that the

claimed invention is not limited to an after-market conversion kit. Rather, it appears that Lemoine, as the patentee, was trying to ensure that the subject-receiver assembly was not construed as being limited to use with one type of shotgun or magazine. In fact, Lemoine says as much later in the specification. (*Id.* at col. 3, ll. 1–6 ("Although illustrated in use with a MOSSBERG 500 shotgun, it is to be distinctly understood that the present invention has broader applications, and is equally applicable for use on many other shotguns without undue experimentation and without departing from the invention claimed."); *id.* at col. 3, ll. 16–23 (explaining that "one preferred embodiment [of] the term [removable box magazine] can refer to the SAIGA 12 box-style magazine" but "it is to be distinctly understood that the present invention has broader applications, and is equally applicable for use with any number of other commercially available shotgun magazines without undue experimentation and without departing from the invention claimed").)

Black Aces next contends that, as a practical matter, there is no functional difference between a manufacturer that redesigns its conventional shotgun to accept a removeable box magazine and a consumer that reconfigures his existing conventional shotgun to do the same. Whether this is correct is beside the point. "District courts . . . do not assign terms their broadest reasonable interpretation.  Instead, district courts seek out the correct construction—the construction that most accurately delineates the scope of the claimed invention. . . ." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 740 (Fed. Cir. 2016); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." [citation omitted; internal quotation marks omitted]). Here, as discussed above, Black Aces broad construction is not reasonable when viewed against the language of the claims and the specification. Accordingly, the

Court remains convinced that the phrase "for converting a conventional shotgun" as used in the preamble refers to after-market conversion. As a result, Black Aces proposed construction is rejected.

Because the Court concludes that the preamble limits the scope of the claims, it need not reach Mossberg's argument that Claim 1 is indefinite under Section 112.

**Conclusion**

For the foregoing reasons, the Court construes the term "conventional shotgun" to mean "a traditional shotgun that does not accept a removeable box magazine." The Court further holds that the preamble to Claim 1 is limiting and is therefore part of the claim itself. The Court construes the phrase "for converting a conventional shotgun" in the preamble to Claim 1 to mean "for retrofitting a conventional shotgun after original manufacture."

The parties are directed to meet, confer, and jointly propose a schedule for all remaining pre-trial deadlines, including for any further briefing of dispositive motions, by July 16, 2020.

**SO ORDERED** at Bridgeport, Connecticut, this 16th day of June 2020.

 /s/ Kari A. Dooley
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE